Filed 8/24/20  In re L.M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re L.M. et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>A.M. et al.,<br><br>      Defendants and Appellants. | A158298<br><br>(Contra Costa County Super. Ct. Nos. J17-00890, J17-00891, J17-00892, J17-00893) |

Mother S.M. and father A.M. appeal from an order terminating their parental rights and ordering adoption as the permanent plan for the four children that are the subjects of this Welfare and Institutions Code section 300 dependency proceeding.  S.M. alleges the trial court erred in terminating her parental rights because the beneficial parent-child relationship exception to termination applied.  A.M. alleges noncompliance with the notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).[1]  Both arguments lack merit, and we affirm.

_____

[1] The parents also join in each other's argument.

## BACKGROUND

### The Family and the Petitions

This proceeding commenced on August 9, 2017, when the Contra Costa County Children and Family Services Bureau (Bureau) filed Welfare and Institutions Code section 300 petitions involving four siblings: seven-year-old twins L.M. and T.M., four-year-old Te.M., and their half-sister, 12-year-old L.G.[2] S.M. is the mother of all four children. A.M. is the father of the three younger children. L.G.'s father was deceased before the dependency began.

According to the Bureau, the petitions were necessitated by a long history of "pervasive and severe domestic violence" between S.M. and A.M., some of which was witnessed by the children. The petitions alleged that both parents had placed the children at a substantial risk of harm due to the domestic violence, with an additional allegation that A.M.'s alcohol abuse further impaired his ability to adequately parent the children and contributed to the domestic violence.

### Detention, Jurisdiction, and Disposition

The children were detained and initially placed in two separate foster care homes. They were subsequently placed together with their maternal aunt in Sacramento, by whom adoption would become the permanent plan should reunification fail.

At a jurisdictional hearing in September 2017, S.M. and A.M. pleaded no contest to amended allegations, and the court sustained the petitions as amended. The Bureau recommended family reunification services for the parents, and at an October dispositional hearing, the court adopted the Bureau's recommendations, declaring the children dependents of the juvenile

_____

[2] All undesignated statutory references are to the Welfare and Institutions Code.

court and ordering reunification services and one hour of weekly visitation for both parents.

**Six-month Review**

The Bureau's March 16, 2018 six-month status report provided this update:

S.M. was attending Narcotics Anonymous/Alcoholics Anonymous meetings. She believed her and A.M.'s problems stemmed from his alcohol abuse but she believed he was participating in services to address his issues and complete his case plan. She claimed they had separated the previous month, but the social worker had learned they were actually still together. The social worker reviewed A.M.'s case plan with S.M., and S.M. was disappointed to learn that A.M. was not in fact participating in services. She later contacted the social worker and said A.M. was going to move out of the house. A.M. also contacted the social worker to inform her he was going to let S.M. do what she needed to do to get the children back and he was no longer going to participate in reunification services.

S.M. had attended 16 of 20 scheduled visits during the review period. The Bureau provided this description of the visits: "[S.M.] is consistently attentive and affectionate with her children. [She] listens to the children and responds to their needs. [She] regularly attempts to encourage the children in their general behavior and their personal interactions as a family. [S.M.] has informed the children of her expectations regarding their behavior while in foster care, and for when the children return home to her care. [She] appropriately addresses behavioral concerns during visitation; verbally correcting the children when necessary. [She] had organized birthday events for all of the children. [She] has purchased gifts for all the children, and promised more gifts in the future."

A.M., on the other hand, had attended one visit during the review period and then informed the social worker he would not attend any future visits.

The three older children told the social worker they wanted to return home, while Te.M. wavered between returning home and staying with her aunt.

The Bureau recommended continued reunification services for both parents. It believed that S.M. had "consistently worked on her own services, but has not yet been able to demonstrate the acts of protection over time." She had a history of allowing A.M. to return to the home, and the Bureau wanted to ensure she was equipped with safety plans and resources to keep the children safe. The Bureau also hoped A.M. would resume visitation and reengage in services.

At a six-month review hearing on March 19, 2018, the court found S.M. had made partial progress on addressing the circumstances that led to the dependency proceeding, while A.M. had made minimal progress. It continued reunification services for both parents.

**12-month Review**

Over the next review period, S.M. continued to make progress on her case plan. She had completed a parenting program and initiated a domestic violence safety plan, although it was incomplete and not approved by a domestic violence professional. In early May 2018, A.M. had shown up at her house, kicked the door in, and assaulted her. In mid-August, S.M. informed the social worker she had a new boyfriend and was contemplating filing for divorce from A.M.

S.M. had regularly visited with the children during the review period. When the visits were supervised, the visitation supervisor assessed the visits

as safe and reported that S.M. was "loving and engaged with the children . . . ." In May, she was granted unsupervised visitation, and by July, the visits had progressed to weekend overnights, as it was believed the children would be safe because A.M. was incarcerated following his assault on S.M. The overnight visits were halted in August in anticipation of A.M.'s release and because the aunt wanted to get the children back into their usual routine for the start of the school year. According to the Bureau, S.M. was "anxiously awaiting the return of the children" and "continue[d] to state her willingness to do whatever is necessary to prove to the Court that she can safely raise her children when returned to her care. . . ."

As to A.M., in mid-March, he had contacted the social worker and informed her he was interested in reengaging in services. The Bureau provided him new referrals, but he was incarcerated in May and remained incarcerated at the time of the Bureau's 12-month review report.

The Bureau recommended continued reunification services for S.M. but termination of services for A.M. because he had made "very little progress" in his case plan and there was not a substantial probability the children could be returned to his care if his services were extended to the 18-month mark.

At a contested 12-month review hearing, the court adopted the Bureau's recommendations, terminating A.M.'s reunification services and continuing S.M.'s services to the 18-month review.

**18-month Review**

During the next review period, S.M.'s reunification efforts faltered. As described in the Bureau's March 4, 2019 18-month review report: In October 2018, S.M.'s visits were reduced to one hour per week due to several missed and positive drug tests in September and October. She entered a residential

5

treatment program in November 2018 and graduated on January 22, 2019. When asked about aftercare, S.M. told the social worker she had scheduled an early February intake appointment for an outpatient program. In mid-February, however, S.M. told the social worker she had missed the intake appointment and was not going to drug testing, therapy, 12-step meetings, or visits with her children because she did not have a car. She was offered bus tickets but did not avail herself of this option. Prior to entering the residential treatment, S.M. had missed four visits with the children, and after graduation, she had only visited with them once.

Meanwhile, in December 2018, A.M. had been released from custody and requested visits or phone calls with the children, whom he had not seen in eight months. He was allowed a one supervised call a week.

The children continued to reside with their maternal aunt, which was a generally positive placement.

On January 20, 2019, while still in the treatment program, S.M. celebrated the twins' birthday with the three youngest children and the aunt. L.G. was not there because she was on restriction for having left the aunt's house and going to a friend's house instead of a scheduled visit with her mother the prior weekend. She said she left because she was upset with her mother and did not want to see her.

The social worker visited the children on February 22, 2019. The children reported things were going well. L.G. told the social worker that she was frustrated with her mother for not following through and said she would rather stay with her aunt because she " 'behaves like an adult.' " She reported not minding having missed the twins' birthday celebration because she was upset with her mother and did not want to see her. L.M. told the social worker that he acts "goofy" after his visits with his mother "so nobody

knows he is sad." He reported feeling safe with his aunt but preferred to go home to his mother. T.M. also reported feeling safe and cared for in her aunt's home but often asked to move home with her mother. Te.M. was very attached to her aunt and felt safe with her, but also missed S.M. and had asked many times to see her father.

With this summary, the Bureau recommended termination of reunification services: "The mother, [S.M.], has had 18 months of Family Reunification Services, has not fully resolved the problems th[at] contributed to the children's harm and removal, and has only recently begun to address her substance abuse issues. Even upon entering and completing a treatment program, [S.M.] has continued to miss drug tests and has not participated in any aftercare services or visited her children. Despite the fact that she has been offered transportation assistance by the undersigned in the past, [S.M.] did not attempt to remedy her transportation issues by calling and requesting this service. As the mother has exhausted 18 months of Family Reunification Services, the Bureau recommends termination of Family Reunification Services."

**Contested 18-month Review Hearing**

On April 29, 2019, the court held a contested 18-month review hearing and a hearing on the applicability of ICWA, an issue we describe in greater detail below. After the court found that the children were not Indian children and ICWA did not apply, the hearing turned to the contested 18-month review.

Social worker Susan van Landingham was the only witness and testified as follows: S.M. had been called to drug test 14 times since February 7, with 13 no shows and one pending result. She had completed a residential treatment program in January, as well as parenting, anger

7

management, and domestic violence classes, but she had not engaged in any out-patient treatment. The children enjoyed their visits with their mother and missed her.

Ms. van Landingham testified A.M. had visited the children on March 27. Although he was 35 minutes late, he and the children enjoyed the remainder of the visit.

After argument by counsel, the court terminated reunification services for S.M. and set the matter for a section 366.26 permanency hearing. It ordered a minimum of one visit a month for S.M. pending the permanency hearing.

### Section 366.26 Report

In its section 366.26 report, the Bureau summarized S.M.'s visitation history, describing regular and positive visits until October 2018, when she had two positive drug tests and several no shows. Before entering an in-patient treatment program on November 30, 2018, she missed four visits. She had five visits from February to June 2019, but then missed two scheduled visits in July 2019. When she missed visits, the children became very upset, some taking their anger and frustration out on their siblings. L.G. had chosen to not participate in some visits due to her disappointment in her mother for failing to reunify with her and her siblings.

The Bureau reported that the social worker visited the children on July 23, 2019. During that visit, L.G. expressed a readiness to move forward with adoption by her aunt. She was able to cope with not returning to her mother, whom she understood had been given a chance to reunify but could not do what she needed to do. T.M. expressed sadness at S.M.'s inability to do what she needed to do to get her and her siblings back, but she was happy she and her siblings were together in one home, and she wanted to be adopted by her

8

aunt. L.M. continued to struggle with not being able to return to his mother and expressed conflicting feelings about the situation, conveying both that he wanted to be adopted and that he did not. He said it made him feel bad when his mother and father missed their visits, and his aunt reported that he would become angry and have behavioral issues after missed visits, taking his frustrations out on the aunt and his siblings. Lastly, Te.M. expressed sadness at not being able to return to her mother's care and said it made her sad when her mother missed their visits. She said that if she could not be with her mother, the next best thing was being with her aunt.

As to A.M.'s visitation record, he had visited the children a total of nine times over the course of the dependency proceeding. At the time of the report, he was afforded a one-hour visit per month plus weekly phone calls. He was incarcerated from May to December 2018. In 2019, he attended his March and May visits and missed his June and July visits.

According to the Bureau, the four children were considered adoptable because their aunt, with whom they had been placed for nearly two years, was committed to adopting them. The Bureau recommended termination of parental rights with adoption as the permanent plan, as the aunt was "willing and able to provide all four [children] the love, safety, security, and stability they all require."

**Section 366.26 Permanency Hearing**

On August 19, 2019, the matter came on for a section 366.26 permanency hearing. Counsel for the Bureau and the children submitted on the Bureau's report. S.M.'s counsel objected to the Bureau's recommendation, urging the court to consider a guardianship in lieu of adoption: "S.M. has a very close relationship with the children. The children are very close with her as well and that is reflected in the report, especially

9

the younger ones' really struggling whether they want to be adopted or not. She is in the children's lives. She's not going anywhere. She actually shared with me this morning and said I could share with the Court. She said if she could do this all over again she would. She's going to continue on her own self-improvement and self-help. She supports the children where they are right now with her sister, but given the very close relationship and connection the children have with her, she would respectfully request that the Court issue a guardianship if the Court is going to terminate as opposed to an adoption."

Counsel for A.M. also objected to the Bureau's recommendation and made an oral section 388 motion for additional services. The court denied the motion, finding there had not been a significant change in circumstances and it would not be in the children's best interests to reinstate A.M.'s reunification services.

The court then observed: "I'm going to focus on the relationship between the kids and their mom, and I do know that they are heartbroken when she does not make visits. I also know that last year I believe they were having unsupervised overnights in the home. So . . . with this type of background with a relative caregiver who has stepped up and been taking care of these children for quite some time and they are in the age range, normally I would anticipate seeing a recommendation for legal guardianship, and I want to hear from you [counsel for the children] regarding further why termination would be best for them at this time."

Counsel for the children responded that while the children called their parents " 'mom' and 'dad,' " their aunt had been their "primary parental figure" the last two years, providing their day-to-day care and acting as their parent. Counsel noted that A.M. had not been consistent with visits "in a

long time," and while S.M. had increased visitation earlier in the proceeding, she recently had "not been consistent with her visitation and her visits have been limited since the termination of [family reunification] services." Reiterating that the aunt was the children's actual parent figure, counsel concluded, "I think also the report does a good job of talking about each child's feelings toward adoption, that they have considered that, and they in essence—I think the stability is so important because they love their parents, but also unfortunately, all seem like they understand that their parents cannot care for them, and it's really with their aunt where they have been stable for the most amount of time in their life, in my opinion."

After advising the court that S.M. did not wish to testify, counsel for S.M. again urged the court to order a guardianship as the permanent plan:

"So mother understands the need that the children need to have stability, but what she was asking is why can't it be stability under a guardianship because the children do call her 'mother' and 'mama mama,' and they look to her all the time.  They are in frequent contact by telephone.

"Last night all four children called her, were crying, were sad.  I think they may vacillate between wanting to be adopted or not, or maybe they are saying different things, I'm not sure.  I know mother does a good job to try to comfort the children and support the placement because she understands that that's important, but mother, she's attended most of the visits and I believe the two visits she missed there's quite a distance to get there and mother does have challenges with sometimes transportation, but she always tries her best to be at the visits and has made most of them especially given the long distance.

"But in terms of the bond, the children are so close with their mother who they look to as their mother and so we really believe that guardianship

11

would be the most appropriate permanent plan for these children, what's in their best interest because they have a mother and a father that they look to."

After A.M.'s counsel similarly advocated for a guardianship, county counsel noted that the parents bore the burden of establishing the beneficial parent-child relationship exception to termination of parental rights, going on to argue: "If they had continued to be consistent with visits I think we might have a very different report, but as the report sets forth the parents have dropped off their visitation with the children resulting in the children at a minimum being disappointed and also being angry with their parents. Legal guardianship would not allow for any stability with that, and so we believe that the parental exception does not apply and it's best to proceed with adoption."

At the conclusion of argument, the court terminated parental rights and ordered adoption as the permanent plan, finding that the parents had not established an exception that outweighed the children's need for permanence. It explained:

"Well, this case has been ongoing now for a couple of years and at this juncture the law makes it very clear that the Court is to impose the most permanent plan available, and the recommendation is for termination. I have been hopeful that the parents would have been able to reunify as I believe all of us were, but that was not possible and it did not occur.

"I believe that the parents love their children and I believe that the children love their parents. However, we have a relative caregiver who has been the day-to-day caregiver now for a couple of years who has stepped up and made quite a commitment to the children, and she is indicating that she is willing and able to adopt the children, a sibling group of four.

"It's clear from the report that the kids have been extremely disappointed with the lack of visitation in the last time frame. I did tag in my report on page 16 when I read the report on Friday, that apparently during a visit on July 23rd I believe it was when I believe the father called the day of his visit due to being stuck in Hercules that the worker was already en route to the caregiver's home, that the children were in tears when the worker arrived when they found out that their visit had been cancelled. That's not the only entry where the kids have been disappointed in the missed visits with their mom as well."

That same day, the court entered a written order terminating parental rights and ordering adoption as the permanent plan.

S.M. and A.M. filed timely notices of appeal.

## DISCUSSION

### The Juvenile Court Did Not Err in Ordering Adoption as the Permanent Plan for the Children

#### *The Beneficial Parent-Child Relationship Exception to the Termination of Parental Rights*

At a section 366.26 permanency hearing, the juvenile court determines a permanent plan for the dependent child, with options that include adoption, guardianship, or long-term foster care. (§ 366.26; *In re Anthony B.* (2015) 239 Cal.App.4th 389, 394; *In re S.B.* (2008) 164 Cal.App.4th 289, 296.) " 'If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citations.] In order to avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply." (*In re Anthony B.*, at p. 395; accord, *In re E.T.* (2018) 31 Cal.App.5th 68, 76.) One such exception exists where the

13

"court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re E.T.,* at p. 76; *In re S.B.*, at p. 297.)

While the requirement of "regular visitation and contact" is relatively straightforward, the second prong of the exception involves a more nuanced analysis and requires a parent to prove that the bond he or she shares with the child "is sufficiently strong that the child would suffer detriment from its termination." (*In re Grace P.* (2017) 8 Cal.App.5th 605, 613.) In *In re Autumn H.* (1994) 27 Cal.App.4th 567, the court provided this oft-quoted interpretation of the second prong: "benefit from continuing the relationship" means "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Id.* at pp. 574–575; see *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1347 ["*Autumn H.* has been widely followed"].)

The parent asserting the beneficial parent-child relationship exception bears the burden of demonstrating its applicability. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 997; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.)

***The Standard of Review***

The standard of review applicable to a court's decision declining to apply the beneficial parent-child relationship exception to termination is unsettled. Some courts have reviewed such orders for substantial evidence. (See, e.g., *In re Christopher L.* (2006) 143 Cal.App.4th 1326; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) Others have applied the abuse of discretion standard. (See, e.g., *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449; *In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.) More recently, the trend appears to be an approach that incorporates both the substantial evidence and abuse of discretion standards. For example, the Sixth District adopted this hybrid approach in *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315, where it reasoned:

"In our view, both standards of review come into play in evaluating a challenge to a juvenile court's determination as to whether the parental or sibling relationship exception to adoption applies in a particular case. Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental or sibling relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination. Thus, as this court noted in *In re I.W.* (2009) 180 Cal.App.4th 1517, a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.] Unless the undisputed facts established the existence of a beneficial parental or sibling relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed.

"The same is not true as to the other component of these adoption exceptions. The other component of both the parental relationship exception

15

and the sibling relationship exception is the requirement that the juvenile court find that the existence of that relationship constitutes a '*compelling reason* for determining that termination would be detrimental.' (§ 366.26, subd. (c)(1)(B), italics added.) A juvenile court finding that the relationship is a 'compelling reason' for finding detriment to the child is based on the facts but is not primarily a factual issue. It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies."

Even within the First District, different standards of review have been applied. For example, Division Four has applied the substantial evidence standard (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166), while Division Three in one instance reviewed for an abuse of discretion (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351), but subsequently adopted the hybrid standard advocated in *In re Bailey J.* (*In re E.T.*, *supra*, 31 Cal.App.5th at p. 76.) This unsettled issue will soon be resolved, as the Supreme Court granted review in Division One's *In re Caden C.* (2019) 34 Cal.App.5th 87, 106 (review granted July 24, 2019, S255839), asking the parties to brief two issues, one of which is "what standard governs appellate review of the beneficial parental relationship exception to adoption . . . ." Until such time as the Supreme Court decides *Caden C.*, however, we must apply what we believe to be the applicable standard, and that is the hybrid approach.

16

### *The Trial Court Did Not Abuse Its Discretion in Ordering Adoption as the Permanent Plan for the Children*

S.M. argues that the juvenile court erred in terminating parental rights because she demonstrated the applicability of the beneficial parent-child relationship exception, that is, that she maintained regular visitation and contact with her children and the children would benefit from continuing the relationship.  We conclude otherwise.

As S.M. notes, the juvenile court did not make an explicit finding on the first prong of the exception, specifically, whether she maintained regular visitation and contact with the children.  Unquestionably, she maintained regular visitation over the first year of the dependency proceeding, with the court so finding at both the six- and 12-month reviews.  Her visitation record the second year, however, was less consistent.  She went from overnight visits in August 2018 to once-a-week supervised visits in October when she had multiple positive and no-show test results.  In October and November, she missed four visits before entering a treatment program in November, had one visit in January while still in the program, and then missed an unspecified number of visits after her graduation.  She attended visits in February and March, two in April, one in June, and missed two visits in July.[3]  Whether or not this visitation record would support a finding of regular visitation is immaterial, however, as we conclude the court did not abuse its discretion in finding that S.M.'s relationship with the children did not outweigh the benefits the children would receive from adoption by their aunt.

This dependency proceeding began in August 2017, and the permanency hearing was in August 2019.  Over those two years, the children

_____

[3] S.M. adds that she had frequent phone contact with the children.  As she herself recognizes, however, this came into the record via argument of counsel and is thus not evidence.

17

resided with their maternal aunt, who, by all accounts, provided a loving and nurturing home. The evidence shows she became the parental figure for the children, handling all of their day-to-day needs and supporting them at home and in their schooling. She has been unwavering in her commitment to their wellbeing and stability.

S.M., on the other hand, faltered in the second year of this proceeding. During that time period, she began skipping visits, missing them in October and November 2018, visiting the children once while she was in a treatment program, visiting a few times after her graduation from the treatment program, and then missing visits again by July—with each missed visit causing great disappointment and sadness in the children. Despite this, S.M. claims that she and her children shared an emotionally significant relationship, the children were attached to her, and the relationship was one that would typically arise from daily interaction. Significantly, the examples she provides to support these claims occurred, with one exception, in the first year of the dependency. That one exception was the January 2019 birthday celebration for the twins, which L.G. did not attend because she did not want to see her mother. While S.M. may perhaps have had a colorable argument at the time of the 12-month review that a beneficial relationship existed, her conduct over the next 12 months undermined that relationship. And the evidence of a qualifying beneficial relationship during those 12 months is lacking.

We do not question S.M.'s love for her children and their love for her. Indeed, the court recognized this mutual love at the permanency hearing. And it may be that the children would gain *some* benefit from maintaining the parent-child relationship. But that is not enough, as the court in *In re A.S.* (2018) 28 Cal.App.5th 131, 153 summarized: " 'A biological parent who

has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' [Citation.] 'Evidence that a parent has maintained " 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship." ' [Citations.] Instead, to rise to the level that would warrant the selection of a permanent plan other than adoption, a parent must show 'a substantial emotional attachment that would cause the children to suffer great harm if severed.' [Citation.] Even if parents demonstrate a substantial emotional attachment, '[t]he benefit to the child from continuing such a relationship must also be such that the relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " ' " We conclude here that the juvenile court did not err in finding that S.M. failed to carry her burden in establishing this exception.

**There Was No Reversible ICWA Error**

*Background*

On August 8, 2017—the day before the section 300 petitions were filed—the social worker asked S.M. and A.M. if they were aware of any Native American ancestry their children might have. S.M. stated that she had Cherokee ancestry, while A.M. denied any Native American ancestry. Accordingly, in an ICWA-010(A) attachment to the petitions, the Bureau indicated the children may have Indian ancestry.

At a detention hearing on August 10, the children were ordered detained. The detention order indicated that the children "may be" Indian children and ordered the Bureau to provide notice of the proceeding as

19

required by law, with proof of such notice filed with the court. That same day, S.M. and A.M. filed parental notification of Indian status forms (ICWA-020), checking the box stating that "I have no Indian ancestry as far as I know."

On August 28, S.M. filed a second ICWA-020 form, this time checking the box that said, "One or more of my parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe."

On October 23, it was determined that S.M. had "provided conflicting information on ICWA-020 forms and she should complete[] an ICWA-030." That same day, the social worked questioned the maternal aunt about the family's Native American ancestry. The aunt said the maternal great grandfather was full-blood Cherokee, but she did not know his name, where or when he was born, or where or when he passed away, and no one else in family could be contacted because they were all deceased.

On November 29, 2018, a social worker intern asked all four children if they had any knowledge of Indian ancestry in their family, and all denied any such knowledge. The intern also contacted the maternal aunt with same inquiry, and she also denied any knowledge of Indian ancestry. A week later, the intern asked S.M. about Indian ancestry in her family, and she likewise denied any Native American ancestry and denied having any new information to support her previous claim.

On December 19, 2018, the Bureau mailed ICWA notices. According to the Bureau's 18-month review report, on January 3, 2019, the Eastern Band of Cherokee Indians responded with four letters (one for each child) stating that the children are not eligible to register, and on January 31, the United Keetoowah Band of Cherokee did the same.

Attached to the 18-month review report was an ICWA packet that included a completed ICWA-030 form for each child. The forms listed the children's full names, dates and place of birth; S.M.'s full name (both maiden and married), address, and date and place of birth; S.M.'s mother's full name (both maiden and married), former address, and date of birth; S.M.'s father's name, with his former address and date and place of birth omitted as unknown; S.M.'s grandmother's name, date and month of birth, and former city of residence, with other identifying information omitted as unknown; and S.M.'s grandfather's last name, with all other identifying information omitted as unknown. The form appended S.M.'s second ICWA-020 form in which she indicated she had Native American ancestry, A.M.'s form in which he indicated he did not, the section 300 petitions, and the detention orders.

Also attached to the 18-month review report were the following: proof that the packet was sent via certified mail to S.M., A.M., the Bureau of Indian Affairs, the Secretary of the Interior, the Cherokee Nation, the Eastern Bank of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians, with return receipts from all but A.M., whose packet was undeliverable. Also attached was a letter from the Eastern Band of Cherokee Indians stating that the children were neither registered nor eligible to register as members of the tribe.

On April 29, 2019, the court held a contested 18-month review and a hearing on the applicability of ICWA. Beginning with the ICWA issue, the court confirmed that everyone had received copies of the ICWA documents. County counsel then argued that the Bureau had either received notices that the children were not eligible or that the 60-day time period for responding had expired. Accordingly, it was the Bureau's position that ICWA did not

21

apply.  Counsel for S.M., A.M., and the children all submitted.  The court found that the children were not Indian children and ICWA did not apply.

*Analysis*

A.M. contends that the Bureau failed to comply with the notice requirements of ICWA, asserting two alleged deficiencies:  first, that the notices did not, as the law requires, append copies of the children's birth certificates, and second, that the Bureau did not file the responses from the United Keetoowah Band of Cherokee Indians indicating the children were not eligible for membership.  His contentions are correct, but the errors were harmless.

Before turning to A.M.'s contentions, we address the Bureau's primary argument in opposition to A.M.'s ICWA claims.  Quoting *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520, the Bureau contends ICWA notice was not even required in this case, as both " 'the federal regulations and the California Welfare and Institutions Code require more than a bare suggestion that a child might be an Indian child.' "  There was more than a bare suggestion here, where S.M. stated she had Cherokee ancestry, and her sister stated that their grandfather was "full-blood Cherokee."  We thus turn to A.M.'s arguments.

Notice to a tribe of a dependency proceeding that may involve an Indian child must include a copy of the child's birth certificate, if available. (§ 224.3, subd. (a)(5)(E).)  It appears the birth certificates were not included here.  Errors in ICWA notice are subject to harmless error review, however. (*Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 784; *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16; *In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1409–1410 [failure to follow act not jurisdictional error, but instead subject to harmless error analysis].)  The notices did include the children's

full names, their dates and place of birth, the full names of their parents, and S.M.'s date and place of birth. A.M. does not identify what pertinent information the birth certificates would have provided that was not already contained in the notice, nor does he identify any manner in which omission of the birth certificates may have hampered the tribes' assessment of the children's eligibility for membership. We thus conclude the omission was harmless error.

As to A.M.'s second asserted defect, the Bureau sent the ICWA notice to the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians. According to the Bureau's 18-month review, both the Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee Indian responded that the children are not eligible to register. The ICWA documents filed with the court included the letter from the Eastern Band of Cherokee Indians, but not the letter from the United Keetoowah Band of Cherokee Indians. (See § 224.3, subd. (c) ["Proof of the notice, including copies of notices sent and all return receipts and responses received, shall be filed with the court in advance of the hearing . . ."].) The Bureau filed proof, however, that it sent the notice to the United Keetoowah Band of Cherokee Indians via certified mail, it filed the return receipt confirming that the band received it, and its 18-month review report stated that on January 31, 2019, the band sent four letters advising that the children were not eligible for membership. It is clear from the record that the Bureau was thorough in the notice it provided to the requisite entities and diligent in investigating the children's potential Native American ancestry. Against the record before us, we fail to see any detriment caused by the failure to file the letter from the United Keetoowah Band of

Cherokee Indians, and A.M. identifies none.  This oversight, again, was harmless error.

## DISPOSITION

The order terminating parental rights and ordering adoption as the permanent plan for L.G., T.M., L.M., and Te.M. is affirmed.

 

                        _____

                        Richman, Acting P.J.

We concur:


_____

Stewart, J.


_____

Miller, J.

*In re L.M. et al.* (A158298)